IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
SENIOR JUDGE WALKER D. MILLER

Civil Action No. 07-cv-00474-WDM-KLM

WILLIAM TRUJILLO and
RONALD L. CRUZ,

     Plaintiffs,

v.

HUERFANO COUNTY BOARD OF COUNTY COMMISSIONERS and
ROGER A. CAIN, in his individual capacity,

     Defendants.

---

## ORDER ON MOTION FOR SUMMARY JUDGMENT

---

Miller, J.

     This matter is before me on the Combined Motion for Summary Judgment filed by Defendants Board of County Commissioners of the County of Huerfano (the "Board") and Roger A. Cain ("Cain") (doc no 40). Plaintiffs oppose the motion. Also before me is Defendants' Motion to Strike Exhibits Submitted in Response to Motion for Summary Judgment (doc no 60). I have reviewed the parties' written arguments and find oral argument is not required. For the reasons that follow, the motion for summary judgment will be granted.

     In addition, I will deny the motion to strike as moot. Defendants seek to strike many of Plaintiffs' exhibits on the grounds that the unsworn "declarations" are not proper affidavits for the purpose of summary judgment and many of the documents have not been properly authenticated. Fed. R. Civ. P. 56 requires that affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence,

and show that the affiant is competent to testify on the matters stated." Defendants are correct that many of Plaintiffs' exhibits are technically deficient. However, since these problems can be cured I will nonetheless consider the exhibits to the extent that they proffer facts otherwise admissible in evidence. Even taking into account the facts contained in the unauthenticated exhibits, however, I conclude that Plaintiffs fail to demonstrate a genuine issue of material fact regarding key aspects of their claims and judgment should enter as a matter of law in favor of Defendants.

<u>Background</u>[1]

This is a First Amendment and employment discrimination case. Plaintiffs are two former foremen of the Huerfano County, Colorado Road and Bridge Department. Until a March 2005 reorganization, the Road and Bridge Department was divided into three geographic districts corresponding to the three districts represented by the County's Commissioners. The districts were commonly known by the names of the nearby towns: Walsenburg (the largest), La Veta, and Gardner. Each district had its own base of operations, referred to as a "shop," run by a foreman. The foremen had their own budgets, purchasing authority, and equipment, although some equipment was shared across districts, and each foreman reported to the Board. Before the reorganization, Plaintiff Trujillo was foreman of the Gardner shop and Plaintiff Cruz was foreman of the La Veta shop. The foreman of the Walsenburg shop was William Brunelli ("Brunelli"). Trujillo and Cruz are both Hispanic; Brunelli is non-Hispanic white. At the time their employment ended, Cruz was 65 and Trujillo was 54.

---

[1]The facts set forth here are taken from the parties' briefs and exhibits and are undisputed unless otherwise noted.

In 2004, two of the three seats on the Board were to be filled in the fall election. Trujillo ran in the Democratic primary for the Gardner seat.[2] He lost the primary to Steve Watcherman; Trujillo thereafter supported Watcherman by placing a sign in his yard and making appearances with Watcherman. Defendant Cain won the Republican nomination for the Gardner seat and defeated Watcherman in the general election. Cain and Trujillo knew each other through Trujillo's work in the Road and Bridge Department, since Cain was a resident of the district. They had no historical disagreements and had no criticisms of each other as candidates or as a result of Trujillo's work.

Cruz also publicly supported the Democratic candidates in the election. He first supported Trujillo in the primary by placing a sign in his yard and introducing him to people in La Veta. Cruz also placed a sign for Watcherman in his yard but otherwise took no active role in supporting Watcherman's campaign. Cruz did not know Cain personally and did nothing to actively oppose Cain's candidacy.

As noted, Cain, a Republican, won the open Gardner seat. The open La Veta seat went to Scott King, a Democrat. Trujillo supported King in the primary by distributing flyers and cards for him. The third seat, for the Walsenburg district, was held by Oress DeHerrera ("DeHerrera"), an Hispanic and a Democratic incumbent not up for election in 2004. King and Cain were sworn into office in January 2005.

DeHerrera had for some time believed that the Road and Bridge Department should be reorganized so that there would be a unified system, with a superintendent

---

[2]It appears that although each Commissioner was seated for a particular district, all residents of the county voted for the candidates for the open seats.

overseeing all operations county-wide, consolidated equipment, and greater

coordination between the shops. DeHerrera raised this issue when Cain and King were

elected to the Board. Cain and King also received a recommendation from County

Technical Services, Inc. ("CTSI"), a nonprofit organization serving Colorado counties,

that such a reorganization would increase efficiency and productivity.[3] Accordingly, on

March 9, 2005, the Board unanimously approved a motion from Cain:

> . . . that the three district Road & Bridge system we have
> now be eliminated and a county wide system be initiated;
> that the Road Foreman positions in the Walsenburg,
> Gardner, and La Veta districts be eliminated; that the La
> Veta Road Foreman, Ron Cruz and the Gardner Road
> [Foreman], Bill Trujillo, are reassigned as Operators effective
> March 10, 2005 at the current Road & Bridge Operator's
> salary rate; that the Walsenburg Road Foreman, Bill Brunelli,
> be appointed as Huerfano County Road Supervisor effective
> March 10, 2005 with a $500.00 per month salary increase;
> and, that an Operator/Shop Manager position, who will
> answer to the new county wide road & bridge supervisor be
> established at the Gardner Road and Bridge Shop and the
> La Veta Road & Bridge shop at an annual salary of $33,200.
> Applications for these positions will be taken from within the
> County Road & Bridge Department.

Attch. 1 to Exh. C to Motion for S.J. (doc no 40-4). At the same meeting, the Board also

adopted a set of policies governing disciplinary actions called the "Huerfano County

---

[3]Plaintiffs contend that a similar system had been tried unsuccessfully in the past. The past attempt had kept the three foremen in place and created a supervisor position over them. That structure was found to be inefficient and later eliminated. There is no evidence that the Commissioners were aware of the previous reorganization effort. Plaintiffs also dispute that the CTSI had actually made this recommendation because there is no written documentation. Defendants have presented admissible evidence to prove this fact and Plaintiffs have not presented any evidence to the contrary; accordingly, I conclude that there is no genuine issue of fact regarding the recommendation from CTSI.

Road & Bridge Department Disciplinary Action Policy" ("Disciplinary Policy"). *Id.*

According to the Commissioners, they selected Brunelli to be the Road Supervisor based primarily on the recommendation of DeHerrera and another former Commissioner. They also believed that Brunelli was doing a good job of managing his district, which was the largest of the three.[4] It is undisputed that Cain approached Brunelli approximately one month before the reorganization motion and asked Brunelli if he would be interested in taking the Road Supervisor position. Brunelli was a twenty-year employee of Road and Bridge Department. Brunelli and Cain did not know each other before the election and there is no evidence that Brunelli supported Cain's candidacy or that he even voted in the election.

The Commissioners also left the decision of who to choose as Operator/Shop Managers to Brunelli so that he could pick "lieutenants" that he could work with and who agreed with him on how to run the department. They also believed that this was required by state statute. Although Trujillo and Cruz both applied to be new Shop Managers in their districts, Brunelli chose Jerry Sporcich ("Sporcich"), a nine-year employee, and Nick Archuleta ("Archuleta"), an Hispanic twenty-year employee of the Road and Bridge Department. Plaintiffs do not dispute that Archuleta and Sporcich were qualified for the positions but contend that Plaintiffs were more qualified and should have been chosen. Plaintiffs admit they had had disagreements with Brunelli in the past over shared equipment and how roads should be made. The Board approved

---

[4]Plaintiffs purport to dispute this by offering hearsay evidence that DeHerrera said at some unspecified time in the past that he wanted to get rid of Brunelli. This is inadmissible evidence and is not sufficient to create an issue of fact as to the Board's good faith belief that Brunelli was the most qualified to be the Road Supervisor.

Brunelli's selections for the Shop Manager positions. Pursuant to the new Disciplinary Policy, Brunelli was given co-equal decisionmaking authority over discipline and discharge with the Board, subject to employee rights of appeal to the Board. Disciplinary Policy, Attch. 2 to Exh. C to Motion for S.J. (doc no 40-4). If an employee did not appeal, Brunelli's decision was final. *Id.*

As a result of the reorganization, Plaintiffs' salaries decreased from $38,050.99 to $30,196. Brunelli, Archuleta, and Sporcich all received salary increases in their new positions. The Defendants do not allege that Plaintiffs' demotion and decrease in salary were because of any performance or disciplinary issues. Archuleta and Sporcich apparently voted for Cain in the election but otherwise took no active part in supporting Cain's campaign. Sporcich and Archuleta did not know Cain before he was elected and there is no evidence that Cain, Brunelli, or any one else was aware of how Archuleta and Sporcich had voted.

Trujillo was involuntarily discharged from the Road and Bridge Department on or around July 18, 2005 by Brunelli. The decision was preceded by three events. First, Trujillo was issued a written reprimand for apparently sleeping during a June 3, 2005 safety training session. Attch. 1 to Exh. F to Motion for S.J. (doc no 40-7). Trujillo admits that he closed his eyes during the session but denies sleeping. Brunelli and other employees observed Trujillo and believed that he was sleeping. Trujillo did not appeal the reprimand, apparently because he was unaware of his appeal rights. The second event involved a near accident on July 8, 2005. Trujillo was stopped at an intersection and pulled out in front of a large County vehicle drive by Jason Santisteven, another Road and Bridge Department employee. Santisteven had to slam on the

6

breaks to avoid hitting Trujillo and left large skid marks on the road.  Trujillo contends that the intersection was blind and that he did not see Santisteven coming.  Plaintiffs also contend that a competent manager would have sent additional persons to the location to assist drivers with that intersection, as Cruz had done when he was foreman. Santisteven reported the incident to Brunelli; Brunelli issued a written reprimand of Trujillo and suspended him with pay for three days.  Attch. 2 to Exh. F to Motion for S.J. (doc no 40-7).

Finally on July 11, 2005, just a few days after the near collision, Trujillo pulled down a low-hanging power line and transformer while driving a tandem dump truck. Sporcich arrived on the scene shortly thereafter and reported that he saw Trujillo attempting to pull the power lines off his truck.  According to Trujillo's own written statement, he was raising the box to spread gravel, saw the power line, but thought he would clear it.  Trujillo was cited by the Colorado State Patrol for careless driving. Brunelli decided to terminate Trujillo; there is no evidence that Cain or the Board had any role in the decision.  The letter of termination cited the two driving incidents and stated Brunelli's opinion that Trujillo was "severely negligent" in the performance of his job duties and also referenced the training session.  Ex. 30 to Resp. Brief (doc no 50-31).  Trujillo did not appeal the termination or any other disciplinary action.  Plaintiffs again contend that Cruz's practice had been to send additional crew with the driver to assist in navigating the power lines in that area and that this would have helped avoid the accident.  On the day of the termination, Brunelli gave Trujillo the written reprimand for the near miss, a reprimand for pulling down the power line, and the termination notice.

Cruz's employment ended voluntarily but he contends that he was constructively discharged. Plaintiffs assert that shortly after the reorganization the County began "papering" Cruz's personnel file with documentation of performance and attitude issues as well as formal reprimands. The first incident occurred on or around March 16, 2005, when Brunelli announced at a meeting at the La Veta shop that Sporcich had been selected as shop manager. Cruz became upset and announced Sporcich "has been sucking [Brunelli's] dick long enough to finally get this job." In addition, he stated that another employee was "a lazy bastard" and that only one coworker (not Sporcich) really deserved the job. Cruz was not reprimanded but documentation of the incident, the facts of which Cruz does not dispute, was placed in his personnel file. Exh. 31 to Resp. Brief (doc no 50-32).

Communication and morale in the La Veta shop apparently deteriorated after the reorganization. On June 2, 2005, Brunelli and Sporcich met with Cruz to discuss issues such as attitude, leaving doors open, and spilling fuel; documentation of the conversation was placed in Cruz's personnel file but no discipline was imposed. Exh. 32 to Resp. Brief (doc no 50-33). Cruz was reprimanded and suspended a few weeks later for stating to Brunelli that Trujillo's termination "was a pretty chicken shit thing to do" and that Brunelli was a "chicken shit." Exh. 33 to Resp. Brief (doc no 50-34). Cruz does not deny making these statements and did not appeal the reprimand. Although the Department's Disciplinary Policy has no express provisions concerning use of profanity, it does prohibit insubordination and "[d]isrespect or insolence toward a citizen or fellow employee." Attch. 2 to Exh. C to Motion for S.J. (doc no 40-4).

Nearly six months later, on December 6, 2005, Brunelli issued a written

reprimand to Cruz for allegedly failing to follow the proper notification process for taking time off. Exh. 34 to Resp. Brief (doc no 50-35). The reprimand did not mandate any disciplinary action but was placed in Cruz's personnel file. Cruz appealed the written reprimand to the Board, which unanimously decided to rescind the reprimand as unjustified. Other than the Board's reversal of this reprimand, Brunelli was solely responsible for the decisions to document Cruz's conduct and to impose discipline.

Another note was added to Cruz's personnel file around May 1, 2006 in response to employee complaints about having a messy work area, leaving lights on, and leaving doors open. Exh. 35 to Resp. Brief (doc no 50-36). No disciplinary action was imposed.

Cruz retired on October 31, 2006. He contends that he would have continued working but that he was subjected to a constructive discharge. As grounds, he cites heightened scrutiny and unjustified discipline, discussed above, unfavorable assignments including being assigned old equipment when newer equipment was available for use, and lack of friendliness from his coworkers. He also contends that he complained to Brunelli that he was being harassed and that no one did anything about it. There is no evidence that Cruz made a formal complaint of harassment to Brunelli or to the Board; it appears that Cruz's complaints of harassment occurred in response to the conversations regarding the incidents described above.

Plaintiffs filed charges of discrimination with the EEOC on March 23, 2006. After exhausting their administrative remedies, they filed their complaint in this Court alleging the following claims for relief: (1) violation of the First Amendment against both Defendants for allegedly retaliating against Plaintiffs for engaging in protected political

speech; (2) race discrimination against both Defendants pursuant to 42 U.S.C. §§ 1981

and 1983; (3) race discrimination against the County pursuant to Title VII; (4) violation of

equal protection against both Defendants pursuant to 42 U.S.C.§ 1983; and (5) age

discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29

U.S.C. § 621 *et seq.*, against the County.  Defendants move for summary judgment on

all claims.

## Standard of Review

Summary judgment is appropriate when there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law.  Fed. R.

Civ. P. 56.  A factual issue is genuine if "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby*, 477 U.S.

242, 248 (1986).

Where "the moving party does not bear the ultimate burden of persuasion at trial,

it may satisfy its burden at the summary judgment stage by identifying 'a lack of

evidence for the nonmovant on an essential element of the nonmovant's claim.'"

*Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)).  Then, "[t]o avoid

summary judgment, the nonmovant must establish, at a minimum, an inference of the

presence of each element essential to the case."  *Id.*

## Discussion

1.    Discussion

1.    First Amendment Claim

A five part test is employed to determine whether a public employee's First

Amendment rights were violated by an employer's adverse action: (1) the court must

10

determine whether the employee speaks "pursuant to [his] official duties;" (2) if an employee does not speak pursuant to his official duties, but instead speaks as a citizen, the court must determine whether the subject of the speech is a matter of public concern; if the speech is not a matter of public concern, then the speech is unprotected and the inquiry ends; (3) if the employee speaks as a citizen on a matter of public concern, the court must determine "whether the employee's interest in commenting on the issue outweighs the interest of the state as employer"; (4) assuming the employee's interest outweighs that of the employer, the employee must show that his speech was a "substantial factor or a motivating factor in [a] detrimental employment decision"; and (5) if the employee establishes that his speech was such a factor, "the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech." *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1202-3 (10th Cir. 2007) (citations omitted). "The first three steps are to be resolved by the district court, while the last two are ordinarily for the trier of fact." *Id.* at 1203 (citing *Cragg v. City of Osawatomie*, 143 F.3d 1343, 1346 (10th Cir.1998)).

Defendants argue that Plaintiffs cannot demonstrate that Plaintiffs' political activities and speech were a substantial or motivating factor in the reorganization decision or any subsequent events. I agree.

To withstand summary judgment on the issue of substantial motivation, an employee must produce evidence linking the employer's action to the employee's speech. *Maestas v. Segura*, 416 F.3d 1182, 1188 (10th Cir. 2005) (citations omitted). "Speculation or hunches amidst rumor and innuendo will not suffice." *Id.* at 1189. Although adverse action in close proximity of protected speech may warrant an

inference of retaliatory motive, temporal proximity alone is insufficient to establish that the speech was a substantial motivating factor in the decision. *Id.* An employer's knowledge of the speech together with close temporal proximity may be sufficient to raise an issue of fact regarding causation. *Id.* Other evidence of causation may include evidence that the employer expressed opposition to the employee's speech or evidence the speech implicated the employer in serious misconduct or wrongdoing. *Id.*

Here, the only evidence of causation is the fact that Cain is a Republican and the Plaintiffs supported Democratic candidates and the temporal proximity between Cain's taking office and the reorganization. This is insufficient in light of the fact that the reorganization initiative was first proposed by DeHerrera, a Democrat, not Cain. Moreover, the relevant decisionmaker was the entire Board, not Cain alone, and that Board consisted of two Democrats (one of whose candidacy was supported by Plaintiffs) and one Republican. Plaintiffs' evidence to show that Cain was the moving force behind the decision is speculative and factually unsupported.[5] Moreover, no reasonable jury could conclude that the promotion of Brunelli was motivated by political patronage, since there is absolutely no evidence that Brunelli knew or supported Cain (or even voted in the election, since it is unclear whether Brunelli resided in Huerfano County at the time). Again, the undisputed evidence is that DeHerrera, a Democrat who had worked closely with Brunelli in the Walsenburg district, recommended placing Brunelli in the Road Supervisor position and that the two new Commissioners agreed.

---

[5]Plaintiffs argue that Cain was "in charge of" the Road and Bridge Department because he talked the most at a meeting announcing the reorganization and is often quoted in the newspaper. This inferential leap is not reasonable and is insufficient to create an issue of fact regarding DeHerrera's role in initiating the reorganization.

Similarly, Plaintiffs do not dispute that Brunelli, the foreman of the largest district in the county and a twenty-year employee of the department, was qualified to be the Road Supervisor. Plaintiffs have presented no evidence to show that the Board's decision to promote Brunelli was not in good faith. Although the Plaintiffs would have liked to have had the opportunity to apply for the position themselves, they can point to no facts that indicate that the promotion decision was beyond the authority of the Board or was otherwise irregular.

Moreover, the temporal proximity here does not give rise to an inference of retaliation. Plaintiffs' protected speech would have occurred before the November 2004 election; the reorganization decision was apparently being considered around February 2005. This three month interval does not suggest a retaliatory motive. *See Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir. 1999) (in employment discrimination/retaliation context, three month interval between protected activity and adverse action, standing alone, is insufficient to show causation).

Similarly, I agree with Defendants that there is no evidence that Cain or the Board had any role in the non-selection of Plaintiffs as Shop Managers or the subsequent disciplinary and termination decisions made by Brunelli, other than to reverse the single written reprimand appealed by Cruz. Plaintiffs have not identified any facts giving rise to an inference that Brunelli was motivated by Plaintiffs' previous political activity (or that he was even aware of it) or that he was acting at the behest of Cain. Similarly, Plaintiffs have no evidence to show that Cain or Brunelli were aware of how Archuleta and Sporcich, the new Shop Managers (and both registered Democrats), had voted in the election. Moreover, as noted by Defendants, the disciplinary

reprimands first occurred in June 2005, approximately eight months after any protected speech or political activity. Such a long interval undermines any inference of retaliatory motive, particularly since the facts underlying the disciplinary actions generally are not disputed.

In response, Plaintiffs assert that Cain's retaliatory motive is demonstrated by the issuance, just after the election, of a draft letter of discipline for Trujillo, which the then-sitting Commissioners refused to sign. Plaintiffs, however, offer nothing but speculation to link this letter to Cain. *Bones v. Honeywell Intern., Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) ("Unsubstantiated allegations carry no probative weight in summary judgment proceedings. To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.") (citations omitted). Plaintiffs also argue that Cain was the driving force behind all of the decisions; again, Plaintiffs' evidence is not competent to create an issue of fact in this regard. Accordingly, I agree that summary judgment should enter against both Plaintiffs and in favor of both Defendants on this claim.

      2.   <u>Discrimination</u>

Defendants argue that under Title VII and the ADEA, Plaintiffs cannot claim relief for any alleged employment actions that transpired more than 300 days before Plaintiffs filed their charges of discrimination, including the reorganization. Plaintiffs do not dispute this and I agree with Defendants' assertion. In addition, Defendants contend that Plaintiffs cannot show that Cain is individually liable for any alleged discrimination under 42 U.S.C. § 1983 because he was not personally responsible for the conduct allegedly causing Plaintiffs' injuries. Again, I agree. The reorganization decision was

made by the Board, not Cain individually.  Plaintiffs have not provided any evidence to show that Cain had any role in any decisions thereafter, including the non-selection of Plaintiffs as Shop Managers, the disciplinary decisions, the discharge of Trujillo, or the conditions of work for Cruz.  The claims against Cain in his individual capacity, therefore, fail as a matter of law.

Defendants further argue that the actions of Brunelli cannot be attributed to the Board because the Board, not Brunelli, was the final policy maker for the County. Finally, Defendants assert that Plaintiffs cannot demonstrate that the any of the alleged adverse decisions were a pretext for discrimination.  Because I conclude that Plaintiffs' evidence does not create a genuine issue of material fact as to pretext, I do not address the question of who was the final policy maker in the various adverse employment actions.

"In racial discrimination suits, the elements of a plaintiff's case are the same whether that case is brought under §§ 1981 or 1983 or Title VII."  *Baca v. Sklar*, 398 F.3d 1210, 1218 n. 3 (10th Cir.2005) (quotation and alterations omitted).  In general, a plaintiff alleging employment discrimination may prove intentional discrimination by direct or indirect evidence.  In the absence of direct evidence, the analysis set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802-804 (1973), provides the framework for assessing indirect, or circumstantial, evidence.  *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000).

Under this analysis, the plaintiff bears the initial burden of presenting a *prima facie* case of discrimination.  *Kendrick*, 220 F.3d at 1226.  The essential purpose of the *prima facie* test is to eliminate "the most common nondiscriminatory reasons for the

plaintiff's rejection." *Id.* at 1227 (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981)). *See also St. Mary's Honor Center*, 509 U.S. at 506 (*prima facie* case "in effect creates a presumption that the employer unlawfully discriminated against the employee") (quoting *Burdine*, 450 U.S. at 254) (alteration in quoted material). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its action. *Kendrick*, 220 F.3d at 1226 (quoting *McDonnell Douglas*, 411 U.S. at 802). If the defendant presents such a reason, the plaintiff bears the "ultimate burden" of establishing that these proffered reasons are a pretext for unlawful discrimination. *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1167 (10th Cir. 2000). The plaintiff must show pretext by demonstrating that the defendant was more likely motivated by a discriminatory reason or that the defendant's proffered reason "is unworthy of credence." *Id.* (quotation omitted). *See also Kendrick*, 220 F.3d at 1230 (three ways of showing pretext are: (1) evidence that the defendant's stated reason for the adverse action was false; (2) evidence that the defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or practice when making the adverse decision).

Because there is no direct evidence of discrimination, I evaluate Plaintiffs' claim using the burden-shifting approach set forth in *McDonnell Douglas*. Defendants generally concede for the purpose of summary judgment that Plaintiffs may be able to establish a prima facie case of race and/or age discrimination. Accordingly, I examine each alleged adverse employment action, Defendants' reason for the action, and any

evidence indicative of pretext.

The first alleged adverse employment action is the reorganization, including the decisions to demote Plaintiffs and to promote Brunelli to the Road Supervisor position. Defendants argue that there was a legitimate non-discriminatory reason for the reorganization and for selecting Brunelli, specifically that the Commissioners had good reason to believe that the new structure would be an improvement and that Brunelli was the best candidate for the supervisor job. Defendants further contend that Plaintiffs can point to no evidence that this decision was a pretext for unlawful race discrimination.[6]

Plaintiffs argue in response that discriminatory motive can be inferred from the close temporal proximity between Cain's election and the reorganization. As discussed above, the three month interval does not give rise to an inference of an unlawful motive. Moreover, the reorganization decisions were based on DeHerrera's recommendations, as well as information from other sources such as CTSI, and voted on by the other two Commissioners. DeHerrera belongs to the same protected group as Plaintiffs and there is no evidence of a discriminatory animus on the part of King or Cain.[7] Although Plaintiffs contend that a similar reorganization had been tried before and failed, I note that the previous effort was different from this reorganization and there is no evidence that Cain and the other Commissioners were aware of the failure of the previous reorganization attempt. Under well-established Tenth Circuit law, the court does not

---

[6]As noted, the age discrimination claim cannot be based on this incident, as it occurred more than 300 days before the filing of Plaintiffs' charge of discrimination.

[7]Plaintiffs assert without factual basis that Cain has exhibited racially discriminatory attitudes, but these conclusory opinions do not suffice to create an issue of fact regarding Cain's motives.

examine whether the Defendants' reasons for an adverse employment decision were "wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs." *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999), *abrogated on other grounds by Morgan*, 536 U.S. at 114. Although Plaintiffs seem to disagree that the reorganization was a good idea, the evidence shows that the Commissioners believed in good faith that it would improve efficiency by consolidating operations and budgets under a single supervisor. Accordingly, I agree with Defendants that Plaintiffs have not come forth with evidence sufficient to satisfy their burden of production to show that the reasons for the decisions to demote Plaintiffs and promote Brunelli in the reorganization were a pretext for unlawful race discrimination.

Similarly, Defendants present evidence to show that the selection of Sporcich and Archuleta as Shop Managers, instead of Plaintiffs, was based on non-discriminatory reasons, specifically that Brunelli got along better with these individuals than with Plaintiffs. Moreover, one of the individuals selected for the Shop Manager positions is also in the same protected class as Plaintiffs, which again undermines any inference that Brunelli (or the Board, by affirming the decision) had a discriminatory hostility toward Hispanics. Again, Plaintiffs disagree that the ability to get along with Brunelli and a shared vision of how to run the department should have been given more weight than Plaintiffs' considerable tenure and experience. However, these types of judgments are precisely the kind of business decisions that courts should not second guess, particularly in the absence of evidence that the two individuals selected were unqualified or other indication that the reason given for the decision was false.

Defendants also argue that Trujillo cannot show that his reprimands, suspension, and ultimate discharge were pretextual. Trujillo essentially does not dispute the facts underlying the disciplinary action. Defendants have presented evidence that Brunelli believed in good faith that Trujillo had been negligent and careless about safety, as demonstrated by his apparent sleeping during a safety training course, nearly colliding with another employee, and pulling down a power line and transformer, which could have resulted in very serious injury or death. Brunelli also received information from another employee that after pulling down the power line, Trujillo attempted to move the lines himself, which was a breach of safety protocol. Although Trujillo denies this, Brunelli was entitled to believe the other witness.

Plaintiffs appear to argue that none of the discipline was warranted and that this therefore shows pretext. They contend that no other employee was ever disciplined for sleeping during a training session; however, they also provide no evidence that any other employee was observed to be sleeping during a mandatory safety training session. Again, although Trujillo denies sleeping, he admits he closed his eyes during the training. In light of this admission and without more evidence, no reasonable jury could find that Brunelli's conclusion that Trujillo had been sleeping was a pretextual justification for retaliation. Plaintiffs also point to accidents and other incidents involving other employees that resulted in less discipline than Trujillo's near miss and power line accident. I note that the individuals involved in several of these incidents have Hispanic surnames, which indicates that they are in the same protected class as Plaintiffs; such allegedly disparate treatment is not probative of a discriminatory animus against

Hispanics.[8]  Plaintiffs do not identify any similarly situated individual, outside of Plaintiff's

protected class, who was involved in two potentially hazardous incidents within a short

span of days.[9]

Finally, Plaintiffs assert that pretext is shown because of "witness observations of

workplace discrimination against Hispanics."  Resp. Brief. at 36.  The only specific facts

Plaintiffs offer in support of this assertion is that before the reorganization, Brunelli

"often would not attend the safety classes if [Cruz and Trujillo] were going" and "Brunelli

made a point to always eat his meals separate from [Cruz and Trujillo]" at meetings but

did not do so with non-minority coworkers.  Exh. 12 and 13 to Resp. Brief, Resp. To

Interrog. No. 7 (doc nos 50-13 and 50-14).  These conclusory assertions, devoid of

dates, persons involved, and other specifics, do not carry probative weight to establish

that Brunelli engaged in workplace discrimination.

Turning to Cruz, the parties disagree about whether the documentation,

warnings, and other write-ups placed in Cruz's file amount to an adverse action.  The

Tenth Circuit instructs that I must "liberally interpret" whether an adverse employment

_____

[8]It is also unclear who supervised some of these employees.  An employee with
a different supervisor is not similarly situated for the purpose of determining whether
disparities in discipline are probative of discrimination.  *McGowan v. City of Eufala*, 472
F.3d 736, 745 (10th Cir. 2006) ("Similarly situated employees are those who deal with
the same supervisor and are subject to the same standards governing performance
evaluation and discipline.").

[9]The only possibly similar incident is an event on July 14, 2005, where Sporcich
hit a low-hanging telephone wire.  However, there appear to be several differences from
Trujillo's power line incident, including that Sporcich did not pull down the telephone
wire, was not cited by law enforcement authorities, had the box down on his truck, and
had not been involved in what was determined to be a careless driving incident a few
days earlier.

action exists, examining the unique factors relevant to the particular situation.  *Haynes v. Level 3 Comm'ns, LLC*, 456 F.3d 1215, 1222 (10th Cir. 2006).  The Tenth Circuit has also recognized that numerous warning letters and "write-ups" could amount to an adverse action where they increase the employee's chances of discharge.  *See e.g., Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998).  I will examine, then, whether these were justified, could increase the chances of discharge, or are otherwise indicative of pretext.

The first write-up, relating to Cruz's profane outburst at his coworkers upon learning that Sporcich had been selected as Shop Manager does not give rise to an inference of pretext or discrimination.  Cruz does not deny making the statements, which were clearly inappropriate and in violation of the Disciplinary Policy.  No reasonable jury could conclude that Brunelli made the decision to document this incident because of discriminatory animus, rather than because Cruz's conduct was objectionable.

The next document, approximately three months later, again addressed Cruz's attitude and minor workplace discourtesies.  In a note dated June 2, 2005, Brunelli documents the discussion and notes that Cruz "said that the Commissioners, Jerry [Sporcich] and I were picking on him.  He said he was going to talk to his lawyer about harassment."  Ex. 32 to Resp. Brief (doc no 50-33).  Construing the evidence in the light most favorable to Plaintiffs, a jury could find that this note was unjustified and perhaps part of an effort to document reasons for a later discharge or discipline.

Approximately one month later, on July 19, 2005, Cruz was disciplined with a three-day suspension for calling his supervisor a "chicken shit."  Cruz does not dispute

that he made the statement; he also concedes that the suspension was unlikely to have been overturned had he appealed it.  The Disciplinary Policy expressly prohibits insubordination and disrespect/insolence towards coworkers.  No reasonable jury could conclude that the reason given for the suspension was false and was a pretext for discrimination.

The December 6, 2005 write-up for not properly calling in could be considered unjustified, since it was ultimately reversed.  However, the write-up nearly five months later, on May 1, 2006, was based on complaints from other employees about Cruz's attitude and lack of consideration for other employees, particularly in cleaning up the work space and smoking in equipment cabs.  Exh. 35 to Resp. Brief (doc no 50-36).  Plaintiffs make much of the fact that there were no rules regarding such matters and that no other employee had ever been written up for such issues, but do not deny that the other employees complained.  In response to Brunelli's discussion of these issues, Cruz stated that he and one of the complaining coworkers "don't get along with each other" and that the other employee had "slammed the desk drawer closed when [Cruz] attempted to get his payroll check from inside."  *Id.*  In his deposition, Cruz admits that it is important that people who work together get along.   Ex. 2 to Resp. Brief (doc no 50-3) at 89:17-24.  He also concedes that some of his coworkers may not have been getting along with him because he had accused one of "sucking [Brunelli's] dick" to get a promotion and another of being a "lazy bastard."  *Id.* at 109:17 - 110:3.  Again, there is nothing to indicate that the reason for the write up were false or pretextual - the evidence shows that poor morale and discord were prevalent in the shop but not that Brunelli was singling out Cruz for discriminatory reasons.

22

Construing the evidence in the light most favorable to Plaintiffs, this evidence shows that from March 2005 to October 2006, a period of over 18 months, Cruz received at most two unjustified write-ups. This does not amount to the kind of "papering" of a personnel file that could be indicative of an effort to discharge the employee for unlawful reasons. Given the length of time between these write-ups and the fact that no unjustified discipline or change in job status or benefit resulted, I conclude that these write-ups and other documentation to the personnel file do not, as a matter of law, constitute either an adverse employment action or evidence of pretext.

Plaintiffs also argue that pretext is shown because Cruz complained of harassment and no action was taken. The first complaint was in response to the June 2, 2005 write-up, wherein Cruz allegedly "said that the Commissioners, Jerry [Sporcich] and I were picking on him. He said he was going to talk to his lawyer about harassment." Ex. 32 to Resp. Brief (doc no 50-33). It is unclear what exactly Cruz was alleging was harassment and there is no indication that Cruz ever filed an actual complaint over any particular incident or event. There is also nothing to indicate that Cruz informed Brunelli that Cruz was a victim of racial or national origin discrimination or age discrimination. Similarly, Cruz's second complaint about another employee allegedly slamming a drawer closed when he tried to get a paycheck was presented to Brunelli as a personal dispute, not as a complaint of race discrimination.

I now examine Cruz's allegation of hostile work environment and constructive discharge. To show discrimination based on hostile work environment, a plaintiff must demonstrate that harassment in the work environment was "pervasive or severe enough to alter the terms, conditions, or privilege of employment." *See Bolden v. PRC, Inc.*, 43

F.3d 545, 551 (10th Cir. 1994) ("Specifically, it must be shown that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment and (2) the harassment was racial or stemmed from racial animus") (citations omitted). Constructive discharge is essentially an aggravated hostile work environment. *See Exum v. United States Olympic Comm.*, 389 F.3d 1130, 1135 (10th Cir. 2004) (holding that constructive discharge occurs when "an employer, through unlawful acts, makes working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign" (citing *Pa. State Police v. Suders*, 542 U.S. 129, 159 (2004))).

Plaintiffs' evidence, that Cruz received two possibly unjustified write-ups, made two complaints not specifically about race discrimination that were not investigated, was isolated from his coworkers, had to use older machinery on occasion, had to drive long distances, and had to do some grading on a hot and dusty road, do not demonstrate working conditions so intolerable and permeated with discriminatory harassment that Cruz was forced to leave. It is apparent that Cruz was unhappy with his demotion from foreman to operator and that the working conditions after the reorganization were less favorable for him, but this does not satisfy Cruz's burden to establish that he had no choice but to resign because of pervasive, severe, and inescapable harassment based on race or age.

Because Plaintiffs cannot demonstrate a genuine issue of material fact regarding the validity of the reasons given for the alleged adverse actions, they cannot show that

these reasons were pretext for unlawful discrimination.  They therefore cannot prevail on their claims of age and/or race discrimination.

Accordingly, it is ordered:

1.      The Combined Motion for Summary Judgment filed by Defendants (doc no 40) is granted.  Judgment shall enter in favor of Defendants and against Plaintiffs.

2.      Defendants may have their costs.

3.      Defendants' Motion to Strike Exhibits Submitted in Response to Motion for Summary Judgment (doc no 60) is denied as moot.

DATED at Denver, Colorado, on November 26, 2008.

BY THE COURT:


s/ Walker D. Miller
United States Senior District Judge